*C. L. Redman, A. S. Thurman,* contra.

25167. ATLANTIC FERTILIZER COMPANY *v.* SOUTHERN STATES PHOSPHATE AND FERTILIZER COMPANY.

DECIDED JULY 15, 1936.

*Oliver & Oliver,* for plaintiff.

*H. Wiley Johnson, William Hugh Stephens, Charles L. Redding,* for defendant.

STEPHENS, J. Atlantic Fertilizer Company sued Southern States Phosphate and Fertilizer Company for alleged breach of a contract dated July 14, 1931, for the sale by the defendant to the plaintiff of 4000 tons per annum for three years, total 12,000 tons, of bulk superphosphate, to be shipped during January, February, March, each year, for major portion in about equal monthly quantities, as ordered by the buyer, seller agreeing to supply the buyer's summer and fall requirements, as far as possible under the contract, to be settled for cash against documents as delivered, payable in Savannah funds. (Further provisions omitted.) It was also alleged that the defendant shipped to the plaintiff 1664 tons of acid phosphate in the spring of 1932, and was paid therefor; that no call was made by the plaintiff on the defendant for shipment of acid phosphate either in the fall of 1932 or the spring

of 1933, because the plaintiff was able to secure acid phosphate elsewhere at a less cost than the contract price; and the open market price at said times being higher than the contract price, the plaintiff thus conferred a benefit on the defendant in not then calling for any shipment; that under the custom of trade prevailing among fertilizer dealers and manufacturers in the City of Savannah, available acid phosphate contracted for future delivery over a period of more than one year, when the amount allotted for any one year is not called for in that year, can be called for in the succeeding year and thus be cumulative of and added to the amount contracted to be delivered in the succeeding year; that in pursuance of said custom, and with the acquiescence of the defendant in the plaintiff's omitting to call for deliveries in either the fall of 1932 or the spring of 1933, the plaintiff called on the defendant in October, 1933, to begin deliveries under the contract and to continue to make deliveries in the fall of 1933, and the winter and spring of 1934, until the full balance of 10,336 tons had been delivered to the plaintiff; that the defendant on November 10, 1933, declined to ship to the plaintiff any acid phosphate whatever; and that on November 10, 1933, the open market price of acid phosphate was 60 cents per ton, and the contract price was 50 cents per ton, and therefore the plaintiff sustained a loss of 10 cents per unit, run of pile, on an average of 18.50 per cent. or $1.85 per ton for 10,336 tons, or a total loss through the breach of the contract by the defendant of $19,121.60, with interest from November 10, 1933.

The defendant filed a general demurrer and an answer to the petition. The plaintiff amended the petition in answer to the demurrer, by adopting certain allegations of the defendant's answer and alleging that in addition to the contract of July 14, 1931, the plaintiff and the defendant entered into two other fertilizer contracts which are set out in the defendant's answer, one dated February 7, 1931, and the other dated December 18, 1931, which contracts are incorporated herein, not as a basis for the plaintiff's cause of action under the contract of July 14, 1931, but as illustrating and defining the rights of both parties under the contract of July 14, 1931; that while under the contract of February 7 the defendant was obligated to deliver to the plaintiff during February, March, and April, 1931, the full 2000 tons of super-

phosphate, only 1235 tons were delivered, and were delivered and accepted by consent of both parties under the custom of trade existing in Savannah as set out in the petition, and the remaining 765 tons were delivered during January, February, March, and April, 1932, by consent of both parties and under the custom of trade aforesaid, at a price of 55 cents per unit of available phosphoric acid, and thus the contract of February 7 was terminated, whereas the price under the contract of July 14 was 50 cents per unit; that the 765 tons sued on under the contract of February 7 became material which was used by the defendant in mixing fertilizer for the plaintiff under the contract of December 18, and the 1664 tons delivered under the contract of July 14 was credited by the petitioner on tonnage covered by the contract of July 14, in accordance with the language of the contract of December 18, saying "tonnage of superphosphate under outstanding contracts will be diminished by the amount used and shipped under this contract," and thus a balance of 10,336 tons remained to be delivered to the plaintiff under the contract of July 13; that when the contract of December 18 was under consideration the defendant submitted for the plaintiff's acceptance a contract in which appeared the words, "either buyer or seller shall have the right to suspend or cancel any unshipped goods under this contract, in the event of any occurrences which would make continuance unsatisfactory," but the plaintiff protested against that language on the ground that it would permit the defendant to cancel out the tonnage due under the contract of July 14, would leave the indebtedness of the plaintiff to the defendant unsatisfied, and would deprive the plaintiff of the available means which the contract of July 14 afforded for paying the defendant what the plaintiff owed, and accordingly the contract executed on December 18 was so worded as not to impair the rights of the plaintiff under the contract of July 14, all of which is shown by certain letters attached as exhibits; that when the receipt of July 13, 1932, was signed, which is quoted in the defendant's answer, such receipt did not in any way alter or impair the plaintiff's rights under the contract of July 14, for that in making the settlement and adjustment covered by the receipt the defendant, in order that it might be made clear that the claim of December 18 alone was settled and adjusted by the receipt, wrote upon the contract of December 18 a

cancellation thereof which was signed by both parties, but the defendant did not require any cancellation of the contract of July 14, and the defendant, reciting in said receipt that all claims of every kind held by either against the other party had been settled in full, thereby drew a distinction between the settlement of claims and the cancellation of the outstanding contract, for that at the time of the settlement of claims there were two contracts outstanding between the plaintiff and the defendant, one of which was satisfied and the other not; that the payment made by the plaintiff for 1664 tons, as recited in the plaintiff's petition, was made partly in cash, but the exact amount of cash can not be stated, because of misplaced data, but the balance of the payment was made by the plaintiff by the transfer and assignment to the defendant of accounts and bills receivable, the full particulars being in the hands of the defendant; that in October, 1933, the plaintiff requested the defendant to ship, under the contract of July 14, 1931, 50 tons of acid phosphate to be paid for by a check on receipt of trackage receipt, weight certificate, and bill; and that the plaintiff complied with the terms of the contract as heretofore recited in the petition and in the amendment. The three letters attached as exhibits to the amendment were in substance as follows: On December 11, 1931, the defendant wrote to the plaintiff regarding the proposed agreement, and insisting on the clause giving the right to cancel previous acid phosphate contracts. On December 12, 1931, the plaintiff wrote to the defendant, declining to agree to the provision which would have the effect of cancelling "our acid contract and leaving our present indebtedness to you unpaid. This acid contract affords one of the best means available to us for paying you what we owe you, and we are very anxious to pay that debt." The third letter which was from the defendant to the plaintiff, dated December 15, 1931, enclosed a redraft of the proposed contract, and stated that the defendant's president would call at the plaintiff's office at a certain time.

The contract of February 7, 1931, set out as an exhibit to the answer of the defendant, recited the sale by the defendant to the plaintiff of 2000 tons of bulk superphosphate, shipment during February, March, and April, 1931, in about equal monthly quantities as ordered by buyer, beginning at once, at the price of 55 cents per unit of available phosphoric acid per ton, f. o. b. cars at

seller's tracks Savannah, Georgia, 1000 tons to be settled for by buyer's note in favor of seller due May 1, 1931, without interest, and 1000 tons to be settled for cash against the documents as delivered, etc. The contract of December 18, 1931, attached as an exhibit, between the defendant as "seller" and the plaintiff as "buyer," recited that in consideration of certain indebtedness due by the buyer to the seller, arising out of certain contracts in effect during the past fiscal year, relating to the purchase and sale of certain fertilizer materials, payment of which indebtedness is mutually desired, and for other valuable consideration, the seller agreed to supply certain materials and to mix and ship a quantity of fertilizer estimated at 4000 to 6000 tons, for buyer, the amount to be mutually agreed upon, with the understanding that the difference between the set-up cost and the buyer's selling price to its customers, after deducting all freights prepaid by seller for the account of the buyer, shall be equally divided between the seller and buyer, with seller's proportion to be applied to the outstanding indebtedness of buyer to seller, and buyer's proportion to cover profits, expenses, etc. "Tonnage of superphosphate under outstanding contracts will be diminished by the amount used and shipped under this contract. . . The life of this contract shall be during the fiscal year ending June 1, 1932, and buyer agrees to make satisfactory settlement with seller for all indebtedness outstanding at that time." The receipt of July 13, 1932, referred to in the plaintiff's amendment as quoted in the defendant's answer, was as follows: "This is to acknowledge that all claims of every kind held by the Southern States Phosphate & Fertilizer Company of Augusta, Georgia, against the Atlantic Fertilizer Company of Savannah, Georgia, have been settled in full; also all claims of every kind of the Atlantic Fertilizer Company against the Southern States Phosphate & Fertilizer Company have been settled in full, and the accounts between the two corporations have been squared off. This receipt is signed in duplicate. This July 13, 1932." After the plaintiff filed its amendment the defendant filed a general demurrer to the petition as amended. The court sustained the demurrers and dismissed the petition, and the plaintiff excepted.

■ One of the grounds relied on for sustaining the judgment dismissing the petition is that the plaintiff showed by its own al-

legations that it had breached the contract sued on, that is the contract of July 14, 1931. Under this contract the defendant sold and the plaintiff bought 12,000 tons of fertilizer at the rate of 4000 tons per annum for three years. The petition as amended showed that during the first year of the contract, that is from July 14, 1931, to July 14, 1932, the plaintiff took only 1664 tons out of the 4000 due for that year. The plaintiff gave as an excuse for this failure that it was a benefit to the defendant, because of an increase in the market price of the material, and that it was acquiesced in by the defendant. From July 14, 1932, to July 14, 1933, instead of taking 4000 tons the plaintiff took none at all. Thus at the end of the second year the plaintiff was short 6336 tons of the amount agreed to be taken. This was clearly a serious breach of the contract by the plaintiff. In *Atlanta Oil & Fertilizer Co.* v. *Phosphate Mining Co.*, 144 *Ga.* 75 (2) (86 S. E. 216), it was held that "forbearance of the seller to insist on deliveries in approximately equal monthly quantities, and a consent to deliver the rock at other times and in such amounts as requested by purchaser, with a clear recognition that the aggregate yearly quantity was not to be varied," did not amount to a novation of the contract or to such departure from its terms as to excuse the purchaser from its obligation to take the full amount as contracted for at the end of the year. Under the latter ruling and under the allegations of the petition it must be held that the plaintiff broke the contract sued on. It is true that the defendant allowed the February 7 contract, which was for one year, to lap over into the following year; but the petition, as to the contract of July 14, does not show anything more than a forbearance, which the plaintiff describes as "acquiescence," in the failure by the plaintiff to take the stipulated amount of material.

■ In order to escape the conclusion that the plaintiff breached the contract sued on, the plaintiff alleged a custom in the City of Savannah among fertilizer dealers and manufacturers that "available acid phosphate contracted for future delivery over a period of more than one year, when the amount allotted for any one year or period of time is not called for in that period of time, could be called for in the succeeding year or period of time, and thus to be cumulative of and be added to the amount contracted to be delivered in the . . succeeding year or period of time." This al-

804

leged custom, if allowed as part of the contract under the Code, § 20-704 (3), would have the effect of materially altering the express written contract. While proof of a custom is sometimes admissible to aid in the construction of a contract, under § 38-506, such proof is not admissible when the contract is clear and unambiguous. In such case the express contract prevails over any custom inconsistent therewith. *Brunswig* v. *East Point Milling Co.,* 11 *Ga. App.* 9 (74 S. E. 448); *Cartersville Grocery Co.* v. *Rowland,* 17 *Ga. App.* 42 (2) (86 S. E. 402). In the *Brunswig* case, where there was a contract for the sale of 1000 bushels of corn, a tender of 1071 bushels at the place of delivery was held not a compliance with the contract, and proof of a custom of the trade that there might be a variance of from 50 to 100 bushels was inadmissible. See also *Stamey* v. *Western Union Telegraph Co.,* 92 *Ga.* 613, 616 (18 S. E. 1008, 44 Am. St. R. 95); *Haupt* v. *Phœnix Ins. Co.,* 110 *Ga.* 146 (35 S. E. 342). Under the foregoing decisions the alleged custom can not be admitted as a part of the contract or as an excuse to the plaintiff for not performing its part of the contract. The court did not err in sustaining the demurrer.

*Judgment affirmed. Jenkins, P. J., and Sutton, J., concur.*